IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| USA,<br><br>    Plaintiff,<br><br>    v.<br><br>MARTIN GUADALUPE CARDIEL-RUIZ,<br><br>    Defendant. | Case No. 20-cr-00376-CRB-1<br><br>**ORDER GRANTING MOTION TO DISMISS INDICTMENT** |

Martin Guadalupe Cardiel-Ruiz moves to dismiss an indictment charging him with illegal reentry in violation of 8 U.S.C. § 1326. He argues that his underlying removal order was invalid because the Immigration Court lacked jurisdiction. He also argues that entry of the order was fundamentally unfair because Mr. Cardiel-Ruiz did not receive a genuine opportunity to pursue voluntary departure, for which he was eligible, during his immigration hearing and suffered prejudice as a result. The Court heard argument on April 7, 2021. The Court grants Mr. Cardiel-Ruiz's motion to dismiss because he has satisfied the Ninth Circuit's standard for collaterally attacking a removal order.

**I.    BACKGROUND**

The government has charged Mr. Cardiel-Ruiz with being an alien in the country after deportation in violation of 8 U.S.C. § 1326. See Indictment (dkt. 18) at 3.[1] The indictment alleges that Mr. Cardiel-Ruiz was found in the United States after having been

---

[1] The indictment alleges that Mr. Cardiel-Ruiz is subject to 8 U.S.C. § 1326(b)(1), which states that an alien who has violated § 1326(a) and whose conviction is "subsequent to a conviction for [the] commission of three or more misdemeanors involving drugs, crimes against the person, or both, or a felony (other than an aggravated felony) . . . shall be fined under title 18, imprisoned not more than 10 years, or both."

removed several times—"on or about" July 15, 2011, July 20, 2011, May 30, 2012, and December 6, 2016. Indictment at 3.

Each removal traces back to a removal order entered on July 14, 2011. See Mot. (dkt. 32) at 4; Opp. (dkt. 34) at 5. At that time, Mr. Cardiel-Ruiz was 20 years old and had been living in the United States since he was three months old. See Record of Deportable Alien (dkt. 34-1 Ex. A) at 1–2; Mot. at 2; Opp. at 2. Immigration and Customs Enforcement (ICE) learned of his apparent unlawful status in April 2011 while Mr. Cardiel-Ruiz was incarcerated. See Record of Deportable Alien at 1–2. He had twice been convicted of being under the influence of a controlled substance in violation of California Health & Safety Code section 11550. See id.

On July 1, 2011, immigration authorities served Mr. Cardiel-Ruiz with a Form I-862 Notice to Appear. See NTA (dkt. 34-1 Ex. B) at 1–2. The Notice to Appear ordered Mr. Cardiel-Ruiz to appear before an immigration judge at an address in Florence, Arizona, but stated that the "Date" and "Time" of the hearing were "to be set." Id. at 1. Although there is no evidence of a subsequent hearing notice specifying the date and time, see Chuang Decl. (dkt. 33) ¶ 5, Mr. Cardiel-Ruiz must have learned the date and time because he appeared for his hearing on July 14, 2011.

Near the beginning of that hearing, the Immigration Judge (IJ) informed Mr. Cardiel-Ruiz, who did not have a lawyer, that the IJ would ask "important questions to see if [Mr. Cardiel-Ruiz] may qualify for relief from deportation." Chuang Decl. Ex. C (dkt. 33-3) Track 3 at 00:17-00:23. The IJ noted that he would "consider" Mr. Cardiel-Ruiz "for voluntary departure." Id. at 00:54–01:00. But the IJ clarified that he would "deny voluntary departure" if he found that Mr. Cardiel-Ruiz had "a bad criminal record, or a bad immigration record." Id. at 01:28–01:33.[2] After Mr. Cardiel-Ruiz acknowledged that he entered the United States unlawfully, the IJ concluded that Mr. Cardiel-Ruiz was removable. Id. Track 4 at 00:31–00:50.

---

[2] These initial advisements were made to a group of nine respondents, see Opp. at 2–3, which makes no difference to the Court's analysis.

The IJ then said he would ask "some other questions to see if [Mr. Cardiel-Ruiz] may qualify for any relief." Id. at 00:55–00:60. The IJ asked Mr. Cardiel-Ruiz how long he had lived in the United States, his age, how old he was when he entered the United States, whether he had legal permission to be in the United States, whether anyone had ever attempted to get him lawful status in the United States, whether his parents had lawful status in the United States, whether he was married, how long he had been married, whether his wife was a U.S. citizen, whether he had any children, and whether his wife had petitioned for legal permanent resident status on his behalf. Id. at 01:03–03:58.[3] After Mr. Cardiel-Ruiz indicated that he had been in the country since he was three months old, had been married to a U.S. citizen for four months, and had a step-daughter, the IJ stopped his questioning and explained the general process through which Mr. Cardiel-Ruiz's wife could file a petition to get him a green card, and how Mr. Cardiel-Ruiz could pick up the green card in Mexico. Id. 02:35–03:22.

The IJ then told Mr. Cardiel-Ruiz that he had "two choices." Id. 03:59–04:01. Mr. Cardiel-Ruiz "could seek" either "cancellation of removal" or "voluntary departure." Id. 04:01–5:00. The IJ explained the eligibility requirements for cancellation of removal, including the requirement that Mr. Cardiel-Ruiz did not have "any drug convictions." Id. He then explained that Mr. Cardiel-Ruiz could seek voluntary departure, which "avoids a deportation and allows you to go back to Mexico and wait until your wife files the papers." Id. Track 5 00:00–00:24. The IJ did not explain the eligibility requirements for voluntary departure, but Mr. Cardiel-Ruiz immediately said "I'll do that." Id. 00:22–00:24.

After Mr. Cardiel-Ruiz expressed his desire to pursue voluntary departure, the government notified the IJ that Mr. Cardiel-Ruiz had "two controlled substances convictions," which would "weigh heavily on whether he was prima facie eligible for

---

[3] Although the government suggests that the IJ asked Mr. Cardiel-Ruiz about the "nature of his relationship" with his step-daughter, see Opp. at 4, that is true only to the extent that the IJ asked Mr. Cardiel-Ruiz whether his step-daughter was his wife's "daughter who is also a U.S. Citizen," to which Mr. Cardiel-Ruiz answered "yes, sir," Chuang Decl. Ex. C Track 4 at 02:12–02:23.

1   42B," meaning cancellation of removal (not voluntary departure).  Id. 00:25–00:33.[4]  The

2   following exchange, touching on both cancellation of removal and voluntary departure,

3   then occurred:

4       IJ:      And that could interfere with two things for you.  One, if you have drug
       convictions, that would disqualify you from cancellation.  If they're drug
5      convictions for possession or use or drug paraphernalia involving one of the,
       sort of, illegal federal drugs—
6

7       C-R:   I was under the influence.

8
        IJ:      And if that was . . . an illegal federal drug, even if the conviction was in state
9      court . . . then that presents a problem because you probably can't get
       cancellation.  You probably aren't going to get voluntary departure.  And if
10     you've got two convictions, you might not be able to get both
       of them taken off your record. If you only have one conviction, or if it's one
11     case that has, like, using or being under the influence and drug paraphernalia
       that's connected on the same day, then they might count as sort of the same
12     case, and a State judge can take one drug conviction off your record . . . and
       then it doesn't count any more . . . then it's gone and then that would make
13     you eligible to adjust your status. It would make you, you know, able to have
       your wife get you a green card. As long as you have an active drug
14     conviction, they probably won't grant a green card, so that's kind of a
       problem. If you'd like a couple of weeks to talk it over with an attorney or
15     with the Florence Project, I'd be glad to do that.

16      C-R:   No your honor, I would rather go to Mexico.

17
        IJ:      And, government counsel, does it appear from your records that he actually
18     has drug convictions?

19      G:       Two of them on two separate dates.  Yes sir.
20
        IJ:      So are you opposing voluntary departure for that reason?
21
        G:       Yes sir, based on that.
22

23      IJ:      Well, sir, I'm not going to grant voluntary departure.  So your choice is
       either stay here and figure out if you want to file, or are eligible for any other
24

25

26

27  ---

    [4] 42B is the application form for cancellation of removal.  See U.S. Dep't of Justice, List of
28  Downloadable EOIR Forms, https://www.justice.gov/eoir/list-downloadable-eoir-forms (last
    visited March 25, 2021).

|   |   |
|---|---|
|   | relief, or I'll have to make a deportation order today. |
| C-R: | I'll take the deportation order. |
| IJ: | Then I'll enter an order that you be deported today to Mexico. Since you didn't really ask for voluntary departure, I won't make any decision about granting or denying it. I'll just make an order that you be deported today to Mexico. |

Id. 00:33–03:48. Mr. Cardiel-Ruiz then waived his right to appeal the IJ's decision. Id. 03:48–03:55.

The next day, on July 15, 2011, Mr. Cardiel-Ruiz was removed from the United States. See Opp. at 5. Since then, he has illegally reentered the United States four times and been removed three times. See id.

## II. LEGAL STANDARD

In order to convict a defendant of violating 8 U.S.C. § 1326, the government must prove the following three elements beyond a reasonable doubt: (1) the defendant is a noncitizen; (2) the defendant was previously deported from the United States; and (3) the defendant was found in the United States without the consent of the Attorney General. See 8 U.S.C. § 1326(a).

"Because the underlying removal order serves as a predicate element of an illegal reentry offense under § 1326, a defendant charged with that offense may collaterally attack the removal order under the due process clause." United States v. Pallares-Galan, 359 F.3d 1088, 1095 (9th Cir. 2004) (citing United States v. Mendoza-Lopez, 481 U.S. 828, 837–38 (1987)).

The right to collaterally attack a removal order "is codified at 8 U.S.C. § 1326(d)." United States v. Cisneros-Rodriguez, 813 F.3d 748, 755 (9th Cir. 2015). To prevail, a defendant must show that "(1) the alien exhausted any administrative remedies that may have been available to seek relief against the order; (2) the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and (3) the entry of the order was fundamentally unfair." 8 U.S.C. § 1326(d). The defendant bears the burden of proving each element. See United States v. Gonzalez-

Villalobos, 724 F.3d 1125, 1129 (9th Cir. 2013).

## III. DISCUSSION

Mr. Cardiel-Ruiz argues that the Immigration Court lacked jurisdiction to enter the July 2011 removal order because the Notice to Appear did not specify the date and time of the removal hearing, and that omission was "not cured." Mot. at 5. Mr. Cardiel-Ruiz also argues that his removal hearing was "fundamentally unfair" because the IJ "failed to meaningfully advise Mr. Cardiel-Ruiz of his right to seek pre-hearing voluntary departure," "failed to give Mr. Cardiel-Ruiz a genuine opportunity to develop evidence supporting his application for pre-hearing voluntary departure," and "failed to properly develop the record." Id. at 12, 13, 15. Mr. Cardiel-Ruiz further argues that these errors prejudiced him, and that he need not make any additional showing to satisfy §§ 1326(d)(1) and (d)(2)'s exhaustion and judicial review requirements. Id. at 17, 19.

The Court rejects Mr. Cardiel-Ruiz's jurisdictional argument because, as he acknowledges, Ninth Circuit precedent forecloses his contention that the Immigration Court lacked jurisdiction based on the Notice to Appear. But the Court grants Mr. Cardiel-Ruiz's motion because the IJ did not clearly advise Mr. Cardiel-Ruiz of his eligibility for voluntary departure or give him a meaningful opportunity to pursue that relief, and the IJ's failure to do so prejudiced Mr. Cardiel-Ruiz.

### A.     Immigration Court Jurisdiction

Federal regulations govern whether an Immigration Court has jurisdiction over removal proceedings. See Karingithi v. Whitaker, 913 F.3d 1158, 1158–59 (9th Cir. 2019). Under 8 C.F.R. § 1003.14, jurisdiction vests "when a charging document is filed with the Immigration Court by . . . [s]ervice." A "charging document" includes a "Notice to Appear," and "[s]ervice means physically presenting or mailing a document to the appropriate party." 8 C.F.R. § 1003.13.

Although a Notice to Appear (NTA) is required by regulation to include "the time, place and date of the initial removal hearing, where practicable," 8 C.F.R. § 1003.18(b), "a defective NTA does not affect jurisdiction," United States v. Bastide-Hernandez, 986 F.3d

6

1245, 1248 (9th Cir. 2021). Thus, "the jurisdiction of the immigration court vests upon the filing of an NTA, even one that does not at the time inform the alien of the time, date, and location of the hearing." Id.

Here, no one disputes that a Notice to Appear was filed with the immigration court and served on Mr. Cardiel-Ruiz. See 8 C.F.R. § 1003.13. Therefore, the Immigration Court did not lack jurisdiction to enter Mr. Cardiel-Ruiz's July 2011 removal order. Bastide-Hernandez, 986 F.3d at 1248. Indeed, Mr. Cardiel-Ruiz acknowledges that Bastide-Hernandez forecloses his jurisdictional argument. See Reply (dkt. 36) at 2. In urging the Court to adopt the dissent in that case, see id., he asks the Court to exceed its authority, see Yong v. INS, 208 F.3d 1116, 1119 n.2 (9th Cir. 2000) ("[O]nce a federal circuit court issues a decision, the district courts within that circuit are bound to follow it.").

### B. Opportunity to Seek Voluntary Departure

In certain circumstances, "[t]he Attorney General may permit an alien voluntarily to depart the United States." 8 U.S.C. § 1229c(a)(1). When that happens, the alien avoids the consequences of having been deported under a removal order. See id. The Attorney General has promulgated rules governing when immigration judges may exercise their discretion to grant voluntary departure. See 8 C.F.R. § 1240.26(b)(1). In particular, the alien must not have been convicted of an aggravated felony, must request voluntary departure at or before the merits hearing, must not request any other relief, must concede removability, and must waive appeal. See id.

The parties agree that Mr. Cardiel-Ruiz was eligible for voluntary departure. See Mot. at 13; Opp. at 8. They disagree about whether Mr. Cardiel-Ruiz suffered a due process violation, i.e., whether the IJ properly advised Mr. Cardiel-Ruiz about his eligibility for this discretionary relief and gave Mr. Cardiel-Ruiz a genuine chance to seek it. See Mot. at 13–17; Opp. at 8–14. They also disagree regarding whether Mr. Cardiel-Ruiz suffered prejudice as the result of any due process violation. See Mot. at 17–19; Opp. at 14–16.

7

As discussed above, Mr. Cardiel Ruiz must show that "(1) [he] exhausted any administrative remedies that may have been available to seek relief against the order; (2) the deportation proceedings at which the order was issued improperly deprived [him] of the opportunity for judicial review; and (3) the entry of the order was fundamentally unfair." 8 U.S.C. § 1326(d). The Court concludes that he has done so.

"In applying § 1326(d)," the Ninth Circuit has generally focused "on a single type of defect in a deportation hearing: the IJ's failure to . . . inform the alien of his or her apparent eligibility to apply for" relief from removal and to "afford the alien an opportunity to make application during the hearing." United States v. Gonzalez-Flores, 804 F.3d 920, 926 (9th Cir. 2015) (quoting 8 C.F.R. § 1240.11(a)(2)) (internal quotation marks omitted). An IJ breaches this obligation when the IJ "erroneously tells the alien that no relief is possible." Id. An IJ may also breach this obligation "by stating that the alien is eligible for relief, but immediately negating that statement so that it is as if he was told that he did not qualify . . . which puts the alien in the same position as one who is never made aware that he has a right to seek relief." Id. (citation omitted).

A defendant who can show that such a breach occurred will get most of the way towards successfully collaterally attacking a removal order. First, the breach "relieves the alien of the burden of proving exhaustion of administrative remedies under § 1326(d)(1) because . . . the alien's waiver of the right to an administrative appeal" was not sufficiently "considered and intelligent." Id. at 927 (quoting United States v. Vidal-Mendoza, 705 F.3d 1012, 1015 (9th Cir. 2013)). Second, the breach means that the alien was necessarily "deprived of the opportunity for judicial review pursuant to § 1326(d)(2), because 'an alien who is not made aware that he has a right to seek relief necessarily has no meaningful opportunity to appeal the fact that he was not advised of that right.'" Id. (quoting United States v. Arrieta, 224 F.3d 1076, 1079 (9th Cir. 2000)). Finally, such a breach "violates the alien's right to procedural due process." Id. (citing United States v. Muro-Inclan, 249 F.3d 1180, 1183–84 (9th Cir. 2001)).

But that violation will satisfy § 1326(d)(3)'s "fundamentally unfair" prong only if

the alien can also "prove prejudice."  Id.  To establish prejudice, the defendant "must only show that he had a plausible ground for relief from deportation." Muro-Inclan, 249 F.3d at 1184 (quoting Arrieta, 242 F.3d at 1079).  Although the alien must show "more than . . . a mere possibility" that he would have been granted relief, he need not "show that he actually would have been granted relief."  Id. (citation omitted).

In evaluating whether the defendant has established prejudice, first, the Court must "identify the factors relevant to the IJ's exercise of the discretion for the relief being sought."  Id. at 917 (quoting United States v. Rojas-Pedroza, 716 F.3d 1253, 1263 (9th Cir. 2013)).  Second, the Court must "determine whether, in light of the factors . . . and based on the unique circumstances of the alien's own case, it was plausible (not merely conceivable) that the IJ would have exercised his discretion in the alien's favor." Id. (quoting Rojas-Pedroza, 716 F.3d at 1263).  "In assessing whether the alien carried this burden," the Court must "focus on whether aliens with similar circumstances received relief," Gonzalez-Flores, 804 F.3d at 928, though the existence of a "single case" on point is "plainly insufficient," see United States v. Valdez-Novoa, 780 F.3d 906, 920–21 (9th Cir. 2015).

Here, Mr. Cardiel-Ruiz has shown both that the IJ breached his obligation to give Mr. Cardiel-Ruiz a genuine opportunity to apply for voluntary departure, and that Mr. Cardiel-Ruiz had a plausible ground for relief from deportation based on comparably situated aliens who have been granted voluntary departure.

For starters, Mr. Cardiel-Ruiz was "not meaningfully advised of his right to seek voluntary departure." United States v. Melendez-Castro, 671 F.3d 950, 954 (9th Cir. 2012).  If an IJ tells an alien that he is eligible for voluntary departure, but then quickly tells the alien that "he would not get the relief if he applied for it because he ha[s] a criminal record," the alien has not been adequately advised of his right to seek voluntary departure.  Id.  When that happens, the alien is effectively told that any "application would be futile" rather than advised that he can apply.  Id.  Here, after stating that he would deny an application for voluntary departure based on a "bad criminal record," Chuang Decl. Ex.

9

C Track 3 at 01:28–01:33, and beginning to ask Mr. Cardiel-Ruiz various questions about his background, id. Track 4 at 00:55–03:58, the IJ told Mr. Cardiel-Ruiz that he could seek voluntary departure, id. Track 5 00:00–00:24, and Mr. Cardiel-Ruiz stated his desire to do so, id. 00:22–00:24.  But without any further questioning, and upon learning that Mr. Cardiel-Ruiz had "two controlled substance convictions," id. 00:25–00:33, the IJ stated that he was "not going to grant voluntary departure," id. 02:50-03:03.  The IJ did not explain the eligibility requirements for voluntary departure, indicate that Mr. Cardiel-Ruiz met those requirements (as he did), or give Mr. Cardiel-Ruiz "a genuine opportunity . . . to present evidence of the factors favoring this relief." Melendez-Castro, 617 F.3d at 954.  In substance, the IJ told Mr. Cardiel-Ruiz that any application would be futile based on his two drug convictions.[5]  The IJ did not weigh the equities relevant to voluntary departure, and indeed could not weigh them having short-circuited the inquiry.

The government's contrary arguments are without merit.  The government contends that the IJ did not "immediately negate the statement that [Mr.] Cardiel-Ruiz was eligible for relief." Opp. at 10.  But the IJ never clearly stated that Mr. Cardiel-Ruiz met the eligibility requirements for voluntary departure, and the IJ's statements amounted to a cursory denial even if they mixed in some unrelated talk about green cards and cancellation of removal.  The government also argues that "because almost anything could be construed as a positive or negative equity, an IJ could ask an alien 100 questions about his background and, under Mr. Cardiel-Ruiz's logic, still assert that the immigration court committed a due process violation." Id. at 14 n.3.  That is not true.  As discussed below, the Ninth Circuit has a well-established body of law regarding the factors relevant to granting or denying voluntary departure.  The IJ merely must give the alien a genuine opportunity to present information bearing on those factors and may not prematurely end

---

[5] The IJ appeared interested in helping Mr. Cardiel-Ruiz obtain a green card during the hearing, and the Court does not question the IJ's intentions in any way.  But the IJ's later statement that Mr. Cardiel-Ruiz "didn't really ask for voluntary departure," see Chuang Decl. Track 5 at 03:30–03:48, is perplexing, see id. at 00:22–00:24 ("I'll do that"), and reinforces that the IJ did not give Mr. Cardiel-Ruiz a genuine chance to present relevant information.

that process upon learning of two drug convictions. See Melendez-Castro, 671 F.3d at 954.

Given this "breach" by the IJ, Mr. Cardiel-Ruiz is relieved from further proving his exhaustion of administrative remedies, and has shown that he was improperly deprived of a true opportunity for judicial review. See Gonzalez-Flores, 804 F.3d at 927 (citing 8 U.S.C. §§ 1326(d)(1), (d)(2)). He has also shown that his due process rights were violated. See id.

The only remaining question is whether Mr. Cardiel-Ruiz has carried his burden of showing prejudice. See Valdez-Novoa, 780 F.3d at 916–17. The Court must first consider the positive and negative factors that an IJ would consider relevant to the discretionary decision whether to grant voluntary departure. See Gonzalez-Flores, 804 F.3d at 927. Those factors "are the alien's negative and positive equities." Valdez-Novoa, 780 F.3d at 917. Negative equities include "the existence, seriousness, and recency of any criminal record . . . and other evidence of bad character." Id. (citation omitted). Positive equities include "compensating elements such as long residence here, close family ties in the United States, or humanitarian needs." Id. (citation omitted). Here, the record included Mr. Cardiel-Ruiz's length of residence in the United States, his marriage to a U.S. citizen, the fact he had a stepdaughter, and his two drug convictions. But Mr. Cardiel-Ruiz points to additional positive equities that he could have raised. See Mot. at 17; Valdez-Novoa, 780 F.3d at 917–18. For example, Mr. Cardiel-Ruiz had not provided his stepdaughter's age, and could have "elaborate[d] further on . . . the importance of his presence in his 2-year-old stepdaughter's life." Mot. at 17. He also could have "explain[ed] that he had graduated from a Bay Area high school," and informed the IJ "that he was participating in the San Jose Conservation Corps." Id. Of course, further development of the record may also have revealed negative equities, namely that Mr. Cardiel-Ruiz had "six serious juvenile adjudications for offenses that would have been felonies if he had been an adult," though the government has not elaborated regarding Mr. Cardiel-Ruiz's juvenile record, Opp. at 16.

Having identified the relevant positive and negative equities, the Court must consider whether Mr. Cardiel-Ruiz has shown "that he had a plausible ground for relief from deportation." Muro-Inclan, 249 F.3d at 1184. And that turns on whether he has shown that "aliens with similar circumstances received relief." Gonzalez-Flores, 804 F.3d at 928 (quoting United States v. Rojas-Pedroza, 716 F.3d at 1263). The Court concludes that Mr. Cardiel-Ruiz has carried that burden. Other aliens with similar (and worse) equities have received voluntary departure. See id.; Mot. at 18. Indeed, the Ninth Circuit has previously concluded "that it was plausible a defendant would be granted voluntary departure where the defendant had lived in the United States since he was two months old and had a United States citizen wife and child, even though the defendant's criminal history included firearm possession convictions, and showed association with gang members and prior drug use." Gonzalez-Flores, 804 F.3d at 928 (citing United States v. Alcazar-Bustos, 382 F. App'x 568, 569–71 (9th Cir. 2010)). That alien had juvenile adjudications for burglary, battery, and vehicle theft, along with two adult felony convictions for possession of firearms. See United States v. Alcazar-Bustos, 2009 WL 1033785, at *3 (S.D. Cal. Apr. 16, 2009), rev'd Alcazar-Bustos, 382 F. App'x at 569-71. And while no two cases are identical, Mr. Cardiel-Ruiz has cited numerous additional examples of IJs granting voluntary departure to aliens with arguably worse records and comparable positive equities. See Opp. 18 nn. 9, 10.[6] Based on these examples, it is plausible that Mr. Cardiel-Ruiz would have been granted voluntary departure had he been able to present additional positive equities to the Immigration Court.[7]

---

[6] See also United States v. Cuenca-Vega, 544 F. App'x 688, 690 n.3 (9th Cir. 2013) (holding that an alien who had been in the United States for ten years, since age 13; whose mother was a U.S. citizen; who had graduated from a California high school; and who had been employed for three years leading up to his removal; but who had been convicted of possession of methamphetamine "and some traffic offenses" would plausibly have been granted relief); In re Gonzales-Figeroa, 2006 WL 729784 (BIA Feb. 10, 2006) (affirming a grant of voluntary departure where the alien had four convictions for assault, a conviction for resisting arrest, and numerous other arrests, where the alien reported that he helped his mother with rent and medical expenses and no longer drank); In re Pineda-Castellanos, 2005 WL 3833024 (BIA Nov. 16, 2005) (affirming a grant of voluntary departure where the alien had six criminal convictions "for illegal entry, battery, drunkenness, threatening, a second battery, and driving under the influence").

[7] Since the initial removal order was entered, Mr. Cardiel-Ruiz has been convicted of numerous

12

The government acknowledges that Mr. Cardiel-Ruiz presented cases where "other IJs granted voluntary departure to other aliens," but stresses that Mr. Cardiel-Ruiz "did not cite a single case where his IJ granted voluntary departure to an alien with similar circumstances." Opp. at 15 (emphasis in original). This argument misconstrues the Ninth Circuit's plausibility standard, which simply asks "whether aliens with similar circumstances received relief." Gonzalez-Flores, 804 F.3d at 928; see also Muro-Inclan, 249 F.3d at 1184 (an alien need not show that he "actually would have been granted relief"). The Ninth Circuit has never required analyzing that question on an immigration judge-by-immigration judge basis.[8]

IV.   **CONCLUSION**

For the foregoing reasons, Mr. Cardiel-Ruiz's motion to dismiss the indictment is granted.

**IT IS SO ORDERED.**

Dated: April 12, 2021



CHARLES R. BREYER
United States District Judge

---

crimes (including five convictions for vehicle theft, two for evading, one for first-degree burglary, and one for identity theft). See Opp. at 5. But the Court cannot consider Mr. Cardiel-Ruiz's subsequent criminal convictions, which have nothing to do with his original removal order's validity.

[8] Even if there were such a requirement, the IJ's statements during the hearing do not show that relief would have been implausible. The IJ stated that he would not grant relief if he found that Mr. Cardiel-Ruiz had a "bad criminal record," Chuang Decl. Ex. C Track 1 at 01:28–01:33, but never stated that two convictions for being under the influence of narcotics constituted a "bad criminal record." And the IJ's statement that if Mr. Cardiel-Ruiz had "a drug conviction," then Mr. Cardiel-Ruiz "probably" would not "get voluntary departure," id. Track 5 at 01:19–01:42, left open the possibility that a person with one or more drug convictions could nonetheless be granted voluntary departure.